UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARY ANNE FRANCIA,                    )    NO. CV 05-7416-MAN
                                      )
                Plaintiff,            )
                                      )    MEMORANDUM OPINION
        v.                            )
                                      )    AND ORDER
MICHAEL J. ASTRUE,                    )
Commissioner of the                   )
Social Security Administration,       )
                                      )
                Defendant.            )
_____)

     Plaintiff filed a Complaint on October 14, 2005, seeking review of
the denial by the Social Security Commissioner ("Commissioner")[1] of
Plaintiff's claim for disability insurance benefits ("DIB").   On
November 1, 2005, the parties consented to proceed before the
undersigned United States Magistrate Judge, pursuant to 28 U.S.C. §
636(c).  The parties filed a Joint Stipulation on June 16, 2006, in
which:  Plaintiff seeks an order reversing the Commissioner's decision

---

[1]     Michael J. Astrue became the Commissioner of the Social
Security Administration on February 12, 2007.  Pursuant to Rule 25(d)(1)
of the Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted in place of Commissioner Joanne B. Barnhart as the Defendant
in this action.  No further action need be taken to continue this suit
by reason of the last sentence of Section 205(g) of the Social Security
Act, 42 U.S.C. § 405(g).

and remanding for the payment of benefits or, alternatively, for further administrative proceedings; and Defendant requests that the Commissioner's decision be affirmed.   The Court has taken the parties' Joint Stipulation under submission without oral argument.

### SUMMARY OF ADMINISTRATIVE PROCEEDINGS

Plaintiff filed an application for DIB on December 10, 2002. (Administrative Record ("A.R.") 48-50.)  Plaintiff claims to have been disabled since December 15, 2001, due to thoracic outlet syndrome, impingement syndrome, and possible carpal tunnel syndrome.[2] (A.R. 13-14, 53.)  She has past relevant work experience as a cashier, nurse's aide, licensed practical nurse, and server.  (A.R. 13, 54.)

The Commissioner denied Plaintiff's claim for benefits initially and upon reconsideration. (A.R. 36-46.)  On April 21, 2004, Plaintiff, who was  represented by counsel, appeared and testified at a hearing before Administrative Law Judge Sally Reason ("ALJ").  (A.R. 431-59.) On July 15, 2003, the ALJ denied Plaintiff's DIB claim, and the Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision.  (A.R. 13-20, 5-8.)

///

///

///

---

[2]    Plaintiff amended her onset date from November 20, 2001, to December 15, 2001, to comport with her work history.  (A.R. 13, 48, 440.)

2

## SUMMARY OF ADMINISTRATIVE DECISION

In her July 15, 2004 written decision, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her amended alleged onset date, and was insured for benefits through the date of the decision.  (A.R. 14, 19.)   The ALJ further found that Plaintiff has "severe" physical impairments, consisting of thoracic outlet syndrome, bilateral shoulder impingement syndrome, carpal tunnel syndrome, and cervical disc bulging, but that Plaintiff did not have an impairment or combination of impairments listed in, or medically equivalent to an impairment listed in, Appendix 1, Subpart P, Regulation No. 4.  (A.R. 14-15, 20.) In addition, the ALJ found that Plaintiff was a "younger individual" at the time of the decision, with a "high school or more" education and no transferable work skills.  (A.R. 19-20.) The ALJ further found that Plaintiff's allegations regarding her limitations were not credible.  (A.R. 15-16, 20.)

The ALJ found Plaintiff's residual functional capacity to be as follows:

> [Plaintiff] has the residual functional capacity for lifting/carrying 20 pounds occasionally, 10 pounds frequently, sitting 6 hours in an 8 hour workday, standing and/or walking 6 hours in an 8 hour workday (light work), no more than occasional reaching, handling or fingering and no reaching or lifting over shoulder level.

(A.R. 20.)  Relying upon the testimony of a vocational expert and using

Rules 202.21 and 201.28 of the Medical Vocational Guidelines (the "Grids") as a framework, the ALJ found that Plaintiff could not perform her past relevant work, but could perform other work in the national economy, such as the jobs of usher, surveillance system monitor, and call out operator.[3]  (A.R. 19-20.)  Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id.*)

## STANDARD OF REVIEW

This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996).  The Commissioner's decision must stand if it is supported by substantial evidence and applies the appropriate legal standards.  <u>Saelee v. Chater</u>, 94 F.3d 520, 521 (9th Cir. 1996).  Substantial evidence is "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  <u>Moncada v. Chater</u>, 60 F.3d 521, 523 (9th Cir. 1995).

Although this Court cannot substitute its discretion for that of the Commissioner, this Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion."  <u>Desrosiers v. Sec'y of</u>

---

[3]  Under Rule 202.21, a person who is a "younger" individual, a "high school graduate," and "skilled or semi-skilled," but with no "transferable" skills, is not disabled.  Rule 201.28 directs that a person who is a "younger individual," with a "high school" education, and skills that are not transferable, is not disabled.  20 C.F.R. Pt. 220, App. 2.

Health and Human Serv., 846 F.2d 573, 576 (9th Cir. 1988); *see also* Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995). This Court must uphold the Commissioner's decision if it is supported by substantial evidence and free from legal error, even when the record reasonably supports more than one rational interpretation of the evidence. *Id.* at 1041; *see also* Morgan v. Comm'r. of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Flaten v. Secretary, 44 F.3d 1453, 1457 (9th Cir. 1995).

**DISCUSSION**

Plaintiff alleges five issues. <u>First</u>, Plaintiff contends that the ALJ failed to give adequate weight to the opinion of her treating physician. <u>Second</u>, she contends that the ALJ erred in finding that Plaintiff's impairments did not meet or equal a listed impairment. <u>Third</u>, she contends that the ALJ erred in assessing her residual functional capacity ("RFC"). <u>Fourth</u>, she contends that the ALJ failed to provide a complete hypothetical to the vocational expert. <u>Fifth</u>, she contends that the ALJ erred in assessing her credibility regarding her claimed pain and subjective symptoms. (Joint Stip. at 2.)

**A.   <u>The ALJ Improperly Rejected The Opinion Of Plaintiff's Treating Physician</u>.**

Ordinarily, the opinion of a treating physician should be given great, if not controlling, weight. *See* Social Security Ruling 96-2p.

When the ALJ rejects the opinion of a treating physician, even if it is contradicted, the ALJ may reject that opinion only by providing specific and legitimate reasons for doing so, supported by substantial evidence in the record.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); see also Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)(ALJ erred by rejecting the treating physicians' opinions and relying upon Social Security examiners' opinions in finding that claimant's chronic fatigue syndrome had not rendered her disabled).  Broad and vague reasons will not suffice for rejecting the treating physician's opinion.  McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).

In an April 8, 2003 Medical Source Statement, Dr. John Larsen, Plaintiff's treating orthopedist, found that Plaintiff:  could lift and carry ten pounds occasionally and less than ten pounds frequently; could stand and/or walk less than two hours in an eight-hour workday; could sit less than six hours in an eight-hour workday for one to two hours at a time with breaks; would need to alternate standing and sitting; could never climb, balance, stoop, kneel, crouch, or crawl; has limited reaching, handling, fingering, feeling, seeing, hearing, and speaking abilities; and has environmental restrictions involving heights, moving machinery, temperature extremes, chemicals, and dust.  (A.R. 147-48.)

In a March 31, 2004 Physical Residual Functional Capacity Questionnaire, Dr. Larsen found that Plaintiff:  could sit and/or stand more than two hours continuously; could sit, stand, and/or walk at least six hours in a workday with normal breaks; would need to include periods of walking every 90 minutes for 15 minutes per day; would need a job which permits shifting positions at will from sitting, standing and/or

6

walking; would need to take unscheduled breaks every one to two hours for five minutes during an eight-hour workday; could lift and carry less than ten pounds frequently and ten to twenty pounds occasionally; would have significant limitations in repetitive reaching, handling, or fingering; and was precluded from overhead activities. (A.R. 421-22.) Dr. Larsen provided specific limitations in the following areas: grasping, turning, and twisting objects five to ten percent of Plaintiff's workday; and fine manipulations ten percent of her workday. (A.R. 422.)

In a February 20, 2004 report prepared in connection with Plaintiff's worker's compensation claim, Dr. Larsen described her work restrictions as follows:

On an actual medical, as well as prophylactic basis, [Plaintiff] has a disability which precludes heavy lifting, overhead activities, as well as repetitive motion of the neck, either up and down or side to side.

. . . .

On an actual medical, as well as prophylactic basis, [Plaintiff] should be considered to have lost 75 percent of her pre-injury capacity for lifting, pushing, pulling, grasping, pinching, holding, torquing or performing other activities of comparable physical effort, as well as activities requiring finger dexterity.

1  (A.R. 402.)

2

3      In explaining the basis of her RFC finding, the ALJ stated:

4

5          [Plaintiff] has been treated since prior to her alleged

6      onset date by Dr. Larsen, who completed a first report of

7      injury in December 2001, providing a diagnosis of bilateral

8      carpal tunnel syndrome and placing [Plaintiff] on temporary

9      total disability status from her job as a licensed charge

10     nurse.  His findings in December 2001 included positive

11     Tinel's and Phalen's signs and he treated [Plaintiff] with

12     wrist braces and pain medication.  Dr. Larsen reported that

13     [Plaintiff] was required to do repetitive upper extremity

14     activities at work, and offered the temporary totally

15     disability rating based on the lack of available modified

16     duty.  Although [Plaintiff] had a negative electrodiagnostic

17     study, the Phalen's and Tinel's remained positive on a

18     generally consistent basis and bilateral carpal tunnel

19     syndrome was maintained as a possible, and ultimately, as an

20     accepted diagnosis.  In updates starting near onset,

21     [Plaintiff] also had positive Adson's test and tenderness in

22     the forearms and a diagnosis of thoracic outlet syndrome was

23     entertained.  Electrodiagnostic studies in December 2001

24     showed no evidence of cervical radiculopathy, brachial

25     plexopathy or median or ulnar neuropathy, but were consistent

26     with left thoracic outlet syndrome.  Subsequent examinations

27     showed bilateral positive impingement shoulder syndromes,

28     which became a working diagnosis.  A MRI of the cervical spine

8

showed minimal disc bulging (1mm-2mm), without significant spinal stenosis or foraminal narrowing, which led to a working diagnosis of cervical disc bulging.

Between the multiple dates of re-examination by Dr. Larsen [Plaintiff] treated with chiropractic manipulations, physical therapy and other conservative measures with reports of some alleviation of symptomatology. Dr. Larsen completed a medical source statement in April 2003, diagnosing possible thoracic outlet and carpal tunnel syndromes. He limited lifting/carrying to 10 pounds [occasionally] or less than 10 pounds [frequently], sitting to less than 6 hours in an 8 hour workday, indicated a need for alternation of sitting and standing positions, limited all upper extremity maneuvers and all exposure to certain environments. (Ex. 6F/130). The ALJ does not find a correlation through objective data or subjective history that supports the degree of lifting/carrying limitations assessed or even suggests the environmental restrictions or the sitting restrictions assessed.

In his February 2004 permanent and stationary report, Dr. Larsen indicated [Plaintiff's] complaints of continued symptomology. . . . Based on the cervical spine involvement, [Dr. Larsen] precluded heavy lifting, overhead activities and repetitive motion for the neck. Based on the upper extremities, he opined that [Plaintiff] had lost 75% of her pre-injury capacity for lifting, pushing, pulling, grasping,

9

pinching, holding, torquing or for performing other activities
of comparable physical effort, as well as activities requiring
finger dexterity. . . .

. . . .

In contradiction to Dr. Larsen, the ALJ also notes that
the state agency assessed that [Plaintiff] could perform light
work without climbing, reaching above shoulder level or
forceful gripping/grasping. (Ex. 10E). The ALJ's assessment
does not adopt any opinion in full; rather she incorporates
her analysis of the restrictions that are warranted based on
the cumulative record.

The residual functional capacity assessed by the
undersigned somewhat comports with the final rating by Dr.
Larsen. However, she does not accept or rely on his
assessment of a 75% loss of certain upper extremity
activities. She finds more enlightening insofar as assessing
what [Plaintiff] can do – which is our concern here – that he
rated the pain as only slight to moderate and made moderate by
forceful, heavy or prolonged activities, which essentially
comports with the undersigned's assessment. In response to
counsel's request, Dr. Larsen completed a questionnaire on
work capacities in March 2004, with no additional objective
data reported. He indicated that [Plaintiff] could both sit
for more than 2 hours at a time and stand for more than 2
hours at a time – which was the greatest capacity that the

form listed.  He indicated that she could sit and could stand/walk at least 6 hours in an 8-hour workday each.  He posited that she needed a job that would permit shifting positions at will from sitting, standing or walking.  Dr. Larsen specifically [indicated] that [Plaintiff] would not require unscheduled breaks, but then appeared to contradict that by stating that this would happen [every] 1-2 hours and require a 5 minute rest before a return to work.  He allowed for lifting/carrying 10 pounds occasionally and less than 10 pounds frequently, indicated that [Plaintiff] would have significant limitations doing repetitive reaching, handling or fingering, was precluded from overhead activities and limited in other upper extremity maneuvers, would have good and bad days and would likely be absent from work about twice a month as a result of the impairments or treatments (Ex. 15F).  Dr. Larsen also limited [Plaintiff] from using her hands for grasping, turning or twisting objects more than 5-10% of an 8 hour workday, from doing fine manipulation more than 10% of the day and from any overhead activities.  (Ex. 15F).

The ALJ reiterates that this form is not associated with additional objective data.  In viewing specific functions, moreover, Dr. Larsen assessed a capacity for sitting and standing/walking for 2 hours or more each and for 6 hours each in an 8-hour workday.  His further response that she would need to [have] a job that allows for shifting positions at will appears to be contraindicated by the assessed capacities or to only allow for a consistent interpretation that she

11

should be able to shift positions after having sustained these positions for prolonged times.  In any event, the pre-existing reports, including the permanent and stationary report, is absent for any such limitation.  The assessment of a need for unscheduled breaks is equivocal, but again does not comport with any earlier report.  The 10-pound limit also seems inconsistent with the pre-existing reports, including the final report in February 2004.  In any event, this is essentially a moot point given the vocational expert's testimony and the ALJ's ultimate finding regarding the performable jobs.  Given the subjective history and ratings, the clinical findings, [Plaintiff's] continuing caring for her daughter, her driving her daughter twice [every] school day, and the record in its entirety, the undersigned finds that the degree of limitations Dr. Larsen assessed on use of the hands and fingers is unwarranted.

A critical factor added by Dr. Larsen is that [Plaintiff] would likely be absent from work for two days a month.  First, the undersigned notes that [Plaintiff] has had physical therapy and/or other conservative treatments, but there is no showing that they would require work absences.  Second, within the parameters of the work demands as assessed herein, [Plaintiff] would not be expected to have significant ongoing treatment.  Third, Dr. Larsen's final narrative and earlier reports do not include such a work limitation.  Fourth, [Plaintiff's] pain level, as described by Dr. Larsen via [Plaintiff's] reporting, should not be great if she is

12

restricted in certain activities, as reflected in the ALJ's residual functional capacity assessment. Similarly, the undersigned does not anticipate that [Plaintiff's] days would vary so much as to preclude her from performing with the assessed limit work. Similarly, the headaches, which are not a major factor emphasized in the record, would not be expected to be severe or frequent were [Plaintiff] so limited. Similarly, while [Plaintiff's] alleged sleep deprivation at night and need to nap during the day relate to pain, the undersigned finds that these factors would not be triggered by limiting [Plaintiff] as assessed by the undersigned.

The ALJ reiterates that Dr. Larsen finds that [Plaintiff] is a candidate for vocational rehabilitation. The undersigned also notes that the latest assessment (and April 2003 assessment) were obviously completed for litigation purposes to assist in the Social Security claim. While that factor does [not] negate its potential import, it is one additional factor that causes the undersigned to favor other data. Finally, the ALJ reiterates that [Plaintiff's] continuing care for her daughter and the observations made at the hearing suggest that [Plaintiff] is capable of performing a range of work activity on a day to day and week to week basis. Consequently, the ALJ rejects the latest assessment from Dr. Larsen insofar as it offers or suggests greater functional limitations than is supported by the pre-existing record. As stated above, the ALJ also rejects the February 2004 assessment insofar as it suggests functional limitations that

13

1   are greater in scope or degree than that assessed by the ALJ.

2   The undersigned reiterates that her assessment is more closely

3   aligned with the treating source input, but does give weight

4   to the combination of Dr. Wilson's reports/opinion, the state

5   agency assessment, the observations at the hearing and the

6   breadth of [Plaintiff's] daily activities in formulating a

7   less restrictive residual functional capacity.

8

9   (A.R. 16-19.)

10

11      The ALJ, thus, primarily rejected the limitations found in Dr.

12   Larsen's March 2004 and April 2003 reports on the grounds that they were

13   inconsistent with his previous reports and treatment records.   In

14   addition, the ALJ cited the limitations given in Dr. Larsen's February

15   2004 report (i.e., that Plaintiff was precluded from "heavy lifting,

16   overhead activities, as well as repetitive motion of the neck, either up

17   and down or side to side" and experienced a loss of "75 percent of her

18   pre-injury capacity for lifting, pushing, pulling, grasping, pinching,

19   holding, torquing or performing other activities of comparable physical

20   effort, as well as activities requiring finger dexterity"), as not

21   comporting with the limitations included in his April 2003 and March

22   2004 reports prepared in connection with Plaintiff's claim for DIB, such

23   as the lifting limitations, the need for a sit/stand option, the upper

24   extremity and manipulation limitations, and need to be absent twice

25   monthly.   The ALJ further generally cited the lack of "objective data"

26   to support Dr. Larsen's limitations.

27   ///

28

14

Although the ALJ's point is well-taken that Dr. Larsen did not include in his treatment records and reports precisely identical limitations or discuss Plaintiff's need to take precautions with respect to lifting and using her upper extremities, nonetheless, his April 2003, March 2004, and February 2004 reports do not contain statements that are at complete odds with each other or his treatment records. Dr. Larsen's February 2004 report appears to set forth general limitations regarding the use of Plaintiff's upper extremities, while his later reports set forth limitations on more of a function-by-function basis, as Plaintiff contends. While Dr. Larsen's treatment records do not specifically mention limitations regarding lifting and using the upper extremities, viewed as a whole, they provide some bases for the limitations set forth in his April 2003 and March 2004 reports. Generally, these records paint a portrait of a person with thoracic outlet syndrome and possible carpal tunnel syndrome with attendant unremitting symptoms despite chiropractic and physical treatment[4] and various non-invasive procedures,[5] who ultimately required thoracic outlet release surgery. Although the ALJ asserts that there is no "objective data" to support Dr. Larsen's conclusions regarding Plaintiff's limitations, the record

---

[4]    A.R. 213 -- Dr. Larsen's April 19, 2002 prescription for further chiropractic treatment; 226 -- Dr. Larsen's February 22, 2002 report that Plaintiff was continuing with physical therapy, three times a week, for another six week period; 271-335 -- treatment notes and records for chiropractic services provided by Dr. Milton Payne, D.C., for the period from March 27, 2002 to October 3, 2003; 404-19 -- Dr. Payne's treatment records from October 2003 to February 2004.

[5]    A.R. 155 - Dr. Larsen's February 28, 2003 report, indicating that Plaintiff had undergone two epidural steroid injections without improvement; 164 -- Dr. Larsen's December 20, 2002 report, indicating that Plaintiff was given an intra-articular injection of Lidocaine, Marcaine, and Depo-Medrol; 352 -- August 5, 2003 record, indicating that Plaintiff had undergone a scalene test block; 366 -- August 15, 2003 report, indicating that Plaintiff had undergone a left subacromial decompression with Mumford procedure.

shows that these conclusions are consistent with and supported by objective testing.[6] And, contrary to the ALJ's assertion that the record did not demonstrate that Plaintiff would need to be absent from work to seek treatment, Dr. Larsen expressly noted Dr. Payne's finding that, without frequent treatment, Plaintiff's pain increases substantially,

---

[6]   A.R. 114 -- June 18, 2002 report, noting an abnormal EMG result revealing mild left-sided delay in the ulnar nerve distribution, examination findings of Tinel's positive bilaterally, Erb's point positive on the left, EAST test positive bilaterally, AER positive with bruits and diminished pulses bilaterally, and diagnosing Plaintiff with thoracic outlet syndrome, although further testing was necessary to confirm that diagnosis; 132 -- Dr. Larsen's July 11, 2003 report, indicating examination findings of positive Adson's and apprehension maneuver in the right arm, mild swelling in the right arm, and positive Phalen's and Tinel's sign bilaterally; 137 -- Dr. Larsen's May 30, 2003 report, noting MRI result showing a tear at the musculotendinous junction relative to supraspinatus muscle of the left shoulder, and indicating examination findings of positive impingement, Neer's, Hawkins's and O'Brien's maneuvers; 150 -- March 27, 2003 report, indicating positive Adson's maneuver bilaterally and positive impingement maneuver; 155 -- Dr. Larsen's February 28, 2003 report, indicating examination findings of positive impingement maneuver and Tinel's sign at the volar wrist crease bilaterally; 164 -- Dr. Larsen's December 20, 2002 report, indicating examination findings of positive impingement, Neer's, Hawkins's, and O'Brien's maneuvers; 170 -- Dr. Larsen's November 22, 2002 report, indicating examination findings of positive Adson's maneuver and positive Phalen's, and Tinel's signs; 180 -- Dr. Larsen's September 13, 2002 report, indicating examination findings of positive Adson's maneuver and positive impingement on the right and review of above-noted June 18, 2002 EMG report, showing mild left-sided delay in ulnar nerve disruption; 186 -- Dr. Larsen's August 2, 2002 report, discussing July 12, 2002 MRI of Plaintiff's cervical spine and indicating "[m]inimal 1-2 mm central disc bulge at C4-5 and C5-6, without causing significant spinal stenosis or foraminal narrowing" and July 12, 2002 MRI of her right shoulder, showing "Type II distal acromion causing slight impression of the supraspinatus tendon"; 191 -- July 12, 2002 MRI of the right shoulder; 194 -- Dr. Larsen's July 5, 2002 report, indicating review of records showing slight muscle wasting or atrophy in the left biceps; 201 -- Dr. Larsen's May 31, 2002 report, indicating examination findings of positive Adson's maneuver and positive Phalen's and Tinel's signs; 217 -- Dr. Larsen's March 22, 2002 report, indicating examination findings of positive Adson's maneuver bilaterally and positive Phalen's and Tinel's signs; 233 -- Dr. Larsen's January 18, 2002 report, indicating examination findings of positive Tinel's sign at the volar wrist crease and positive Adson's test bilaterally; 250-51 -- Dr. Larsen's December 7, 2001 report, noting examination findings of positive Tinel's sign at the volar wrist crease and positive Phalen's sign, and prescribing wrist braces.

and her condition deteriorates.[7]  (A.R. 156.)  Accordingly, the ALJ's rejection of Dr. Larsen's limitations is not based on clear and convincing reasons and constitutes error.

Furthermore, the reports of the state agency physician and Dr. Wilson do not constitute substantial evidence to support the ALJ's rejection of the additional limitations stated by Dr. Larsen.  The record does not contain Dr. Wilson's report; it only contains Dr. Larsen's critique of his report.  Indeed, Dr. Larsen provided a lengthy discussion as to why he believed that the Wilson report was not based on sufficient evidence.  (A.R. 394-95, 397-400.)  Without the actual report of Dr. Wilson to review, it is impossible to determine whether it could be substantial evidence, which suggests that Plaintiff's limitations are less than those found by Dr. Larsen.  Moreover, the state agency physician's April 21, 2003 Physical Residual Functional Capacity Assessment, a brief, check-off form, provides little, if any, explanation of the bases for the findings and limitations set forth therein.[8]  (A.R. 117-24.)  Accordingly, the Court cannot determine whether these findings are supported by substantial evidence.

---

[7]      However, as Dr. Larsen specifically set forth Plaintiff's limitations in his reports, including the need to be absent from work due to illness and/or seeking treatment, Plaintiff's contention that the ALJ failed to include additional limitations apart from those found by Dr. Larsen that arose from her headaches (Joint Stip. at 21) is not persuasive.

[8]      The state agency physician made a few cryptic notes on the form (A.R. 120, 123), which are not only brief but also illegible.  *See* Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996)(ALJ properly rejected doctors' psychological evaluations, because they were contained in check-off forms and lacked any explanation of their bases); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992)(ALJ may reject the opinion of a physician if that opinion is conclusory, brief and unsupported by clinical findings).

1      In view of the ALJ's understandable concern that Dr. Larsen's

2 reports are not consistent with his prior report and records, the case

3 will be remanded to allow the ALJ to request that Dr. Larsen clarify and

4 explain his findings regarding Plaintiff's physical RFC. *See* <u>Brown v.</u>

5 <u>Heckler</u>, 713 F.2d 441, 442-43 (9th Cir. 1993)(The Commissioner has an

6 affirmative duty to develop the record, even if the claimant is

7 represented by counsel); 20 C.F.R. §§ 404.1512(e), 416.912(e)(duty to

8 re-contact treating physician); *see also* <u>Thomas v. Barnhart</u>, 278 F.3d

9 947, 956-57, 959 (9th Cir. 2002)(The requirement in 20 C.F.R. §

10 416.912(e) that the Commissioner re-contact treating sources is

11 triggered only where the information from the treating sources is

12 inadequate to make a determination regarding disability).

13

14      As the ALJ must review and reconsider Plaintiff's RFC by developing

15 the record and reconsidering the opinions of Dr. Larsen, the Court does

16 not reach Plaintiff's second issue, *to wit*, that the ALJ committed error

17 in finding that none of her impairments meet or equal a listed

18 impairment.  However, on remand, the ALJ also should again consider

19 whether the combination of Plaintiff's impairments equal any listed

20 impairment.  *See* <u>Lewis v. Apfel</u>, 236 F.3d 503, 514 (9th Cir. 2001).

21

22 **B.**   **<u>The ALJ'S Credibility Determination Warrants Reversal</u>.**

23

24      The law is well-settled that, once a disability claimant produces

25 objective medical evidence of an underlying impairment that could

26 reasonably be expected to cause some level of pain or symptoms of the

27 type of which the claimant alleges, the claimant's subjective complaints

28 regarding the severity of his or her pain and/or symptoms may not be

discredited based solely on a lack of objective medical evidence to corroborate the allegations. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1147-48 (9th Cir. 2001); <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345 (9th Cir. 1991); <u>Fair v. Bowen</u>, 885 F.2d 597, 601 (9th Cir. 1985).  As the Ninth Circuit has explained:

> [A]n ALJ's finding that a claimant generally lacked credibility is a permissible basis to reject excess pain testimony.  But, because a claimant need not present clinical or diagnostic evidence to support the severity of his pain, *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990) (stating that "it is the very nature of excess pain to be out of proportion to the medical evidence"), a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain.

<u>Light v. Social Security Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997). This rule is based on the recognition that pain is an inherently subjective phenomenon, which cannot be objectively verified or measured and varies significantly among individuals.  <u>Bunnell</u>, 947 F.2d at 347.

Unless the evidence suggests affirmatively that a claimant is malingering, the ALJ must provide clear and convincing reasons for rejecting the claimant's excess pain or symptom testimony, such as conflicts between the claimant's testimony and conduct, or internal contradictions in the claimant's testimony. <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993); <u>Light</u>, 119 F.3d at 792.  In determining whether a claimant's testimony regarding the severity of his symptoms is

credible, the ALJ may consider: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." Smolen, 80 F.3d at 1284.

The Court will give great weight to the ALJ's credibility assessment. Anderson v. Sullivan, 914 F.2d 1121, 1124 (9th Cir. 1990); Brawner v. Secretary, 839 F.2d 432, 433 (9th Cir. 1988)(recognizing that the ALJ's credibility determination is to be given great weight when supported specifically). However, when an ALJ's decision rests on a negative credibility evaluation, "the ALJ must make findings on the record and must support those findings by pointing to substantial evidence on the record." Cequerra v. Secretary, 933 F.2d 735, 738 (9th Cir. 1991); Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995)(the ALJ's findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.") When discrediting a claimant's testimony, it is not enough for the ALJ to make only general findings; he must state which pain or symptom testimony is not credible and what evidence suggests that the complaints are not credible. See Swenson v. Sullivan, 876 F.2d 683, 688 (9th Cir. 1979).

In rejecting the credibility of the claimed pain and limitations described by Plaintiff, the ALJ stated:

20

The ALJ has considered [Plaintiff's] complaints of pain and other symptoms in formulating the residual functional capacity (20 CFR 404.1529, Social Security Ruling (SSR) 96-7p). [Plaintiff] testified that she stopped working and remains unable to work because of swelling, numbness, tingling and weakness of the hands, with dropping of objects, severe headaches, dizziness and poor sleep, and claimed that her problems have worsened since then, particularly with over shoulder level activities. She asserted that she has difficulty holding a pen or pencil. She also referred to pain in the neck and shoulders and problems moving her head up or down or side to side to side, with resultant muscle spasms in the neck when so doing. [Plaintiff] apparently denies improvement from August 2003 left shoulder surgery and she stated that she was anticipating having thoracic outlet surgery. She explained that doctors have told her that the thoracic outlet condition is probably the root of the carpal tunnel syndrome. She claimed to currently have almost daily headaches, mostly at night, and triggered by activities such as sitting too long which causes pressure on the neck and shoulders. She estimated that she could lift a maximum of 10 pounds. She indicated that she has difficulty sleeping at night because of pain, with related daytime fatigue and impaired ability to think and concentrate,, and that she often naps 4-5 hours during the day. She testified that household chores, shopping, and supervision of her 6-year-old daughter are affected by her problems. Specifically, she testified that her husband assists her with lifting of heavy groceries.

She acknowledged taking her 6 year old daughter to and from school, doing things with her [during] the day and supervising her.

The ALJ notes that [Plaintiff's] acknowledgments in documents and/or through statements to examining physicians suggest that she remains somewhat more active than as gleaned from testimony. For example, in August 2003, she told Dr. Makhani that her activities include taking her child to school, going on small outings, and going to church and to stores (Ex. 6F). Although her responses and third party responses on SSA document generally comport with testimony, [Plaintiff] indicates that her daughter is dependent on her and that she supervises her activities, including as related to school work, pays bills, and does some household chores (e.g., Exs. 5E-9E).

In any event, the undersigned finds more significant [Plaintiff's] contemporaneous subjective complaints that, as a whole, suggest that the scope and degree of her symptoms is not as great as is presented in testimony and self-serving statements, particularly if she restricts her activities in a fashion that comports with the limitations which the undersigned has assessed. To wit, in a February 2004 permanent and stationary report by Dr. Larsen, [Plaintiff] describes her cervical pain as frequent slight and only made greater than slight to moderate by heavy lifting, overhead activities and repetitive motion of the neck (Ex. 14F/33).

Further, she describes her upper extremities only as frequent slight to moderate and only made moderate by the work functions which the ALJ has specifically ruled out or severely restricted (id). The ALJ also finds it significant that Dr. Larsen's narrative "in progress" treating reports are essentially devoid of complaints or suggestions of significant problems with sitting or a 10 pound weight limitation, despite his subsequent work assessment form.

(A.R. 15-16.)

Plaintiff contends that the ALJ erred in finding her to lack credibility with respect to her claimed symptoms and limitations. Specifically, Plaintiff contends that the ALJ did not adequately characterize her daily activities in her credibility determination. (Joint Stip. at 25-26.) In addition, she contends that the ALJ improperly cited as a basis for her credibility rejection Dr. Larsen's statement that Plaintiff was a candidate for vocational rehabilitation. (Joint Stip. at 27, 30-31.)

The ALJ's credibility determination hinged primarily[9] on the

---

[9] The ALJ also found Plaintiff to lack credibility, in part, based on the ALJ's observation of Plaintiff at the hearing, asserting that Plaintiff "appeared to be comfortable and able to easily move her hands and arms when talking." (A.R. 16.) The ALJ subsequently opined that Plaintiff's "continuing care for her daughter and the observations made at the hearing suggest that [Plaintiff] is capable of performing a restricted range of work activity on a day to day and week to week basis." (A.R. 18-19.)

The inclusion of the ALJ's personal observations of Plaintiff does not render the credibility finding improper. Morgan, 169 F.3d at 600. However, the ALJ's assessment of Plaintiff's appearance at the

evidence of Plaintiff's daily activities, which the ALJ found to be inconsistent with the extent of limitations she claimed. Plaintiff noted in her Daily Activities Questionnaire that she performed light housework "slowly with frequent rests" and shopping with the assistance of her husband. (A.R. 82-87.) At the hearing, Plaintiff testified with respect to her daily activities that: she cannot "do heavy lifting[]" and her husband, therefore, has to assist her in obtaining groceries; she takes her six-year old daughter to and from school; her daughter can bathe and dress herself, but Plaintiff supervises her; her husband assists her with shopping; she has difficulty writing; she has difficulty holding things (like a cup or her purse) without dropping them; and opening jars is difficult. (A.R. 443-45.) As the ALJ noted, Plaintiff reported to a consultative physician on August 14, 2003, that her activities include "doctor's appointments, going to church, taking her daughter to school, small outings, and going to stores." (A.R. 261.) And, as the ALJ noted, Plaintiff's reported activities set forth in her SSA documentation generally comported with her testimony, and include: taking her daughter to school; simple house chores, such as dusting tables, putting clothes in the washer and dryer, and ironing; supervising her daughter; organizing bills; buying prepared and frozen food, which can be microwaved; and eating meals or seeing movies at the mall. (A.R. 80, 82-83,

_____

hearing to discredit her subjective pain testimony is not a strong factor supporting the finding that Plaintiff lacked credibility. *See* Gallant v. Heckler, 753 F.2d 1450, 1455 (9th Cir. 1984)("The fact that a claimant does not exhibit physical manifestations of prolonged pain at the hearing provides little, if any, support for the ALJ's ultimate conclusion that the claimant is not disabled or that his allegations of constant pain are not credible."); Perminter v. Heckler, 765 F.2d 870, 872 (9th Cir. 1985) ("The ALJ's reliance on his personal observations of [claimant] at the hearing has been condemned as 'sit and squirm' jurisprudence.").

While the ALJ may look at Plaintiff's daily activities as a basis for determining whether Plaintiff can perform certain work, the ALJ's decision fails to demonstrate how Plaintiff's above-described activities performed intermittently, without more, correlate to the ability to be engaged in full-time work.  In particular, the ALJ's unexplicated assumption that Plaintiff's supervision of her daughter, payment of bills, and performance of "some household chores" somehow negates Plaintiff's claim of pain is particularly mystifying.  *See* Vertigan v. Halter, 260 F.3d 1044, 1048 (9th Cir. 2001)(ALJ's reliance on the claimant's testimony regarding her daily activities -- that she was able to go grocery shopping with assistance, walk approximately an hour at the mall, play cards, swim, watch television, and read -- in finding that such daily activities involved physical functions that were inconsistent with her claims of pain was in error, as such activities did not consume a "*substantial part*" of the claimant's day)(emphasis in original); Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990)(daily activities may not be relied upon to support an adverse credibility decision where those activities do not affect the claimant's ability to perform appropriate work activities on an ongoing and daily basis).

Certainly, "disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir. 1987)(*quoting* Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981)).  Plaintiff's testimony regarding her daily activities indicates, at best, a capacity for unsustained activities. *See* Magallanes v. Bowen, 881 F.2d at 756; Fair, 885 F.2d at 603 ("many home activities are not easily transferable to

25

what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication"). Although concluding that Plaintiff's daily activities detract from her credibility, the ALJ made no inquiry as to whether Plaintiff performs her daily activities on a schedule consistent with a 40-hour work week. Moreover, although relying on Plaintiff's statements in her SSA documentation as a basis for finding her not credible, the ALJ ignored the statements therein that Plaintiff cannot perform even these minimal household and parental activities on a sustained basis because of pain, and must take frequent rests and perform the tasks slowly. (A.R. 81-83, 86.) *See* Social Security Ruling 96-8p (ability to sustain work activity means "8 hours a day, for 5 days a week, or an equivalent work schedule"); <u>Lester</u>, 81 F.3d at 833 (Commissioner must evaluate the claimant's "ability to work on a *sustained* basis"; emphasis in original)(citing 20 C.F.R. § 416.912(a)); *see also* <u>Reddick</u>, 157 F.3d at 722-23 (it is impermissible for an ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports"). Thus, the ALJ's failure to consider the differences between Plaintiff's daily activities and her ability to work eight hours a day, five days a week, is reversible error. <u>Carradine v. Barnhart</u>, 360 F.3d 751, 756 (7th Cir. 2004)(citing <u>Vertigan</u>, 260 F.3d at 1044, 1049-50).

Further, the ALJ's assertion that Plaintiff only made mention of "slight" pain to Dr. Larsen is belied by the record. Indeed, as detailed above, Plaintiff sought consistent treatment from Dr. Larsen, as well as other physicians, in addition to physical therapy and chiropractic treatment up to three times a week. (*See, supra*, n. 3-5

and text accompanying.)  Rather than indicating that Plaintiff reported only mild or slight symptoms, Dr. Larsen's notes and other records indicate that Plaintiff reported experiencing significant levels of pain, as well as numbness and tingling.  (*See, e.g.,* A.R. 114 -- June 18, 2002 report, noting pain and numbness and that "[Plaintiff] has tried physical therapy, acupuncture and chiropractic therapy; all of which have failed to relieve her symptoms"; 137 -- May 30, 2003 report, noting "persistent pain"; 150 -- March 27, 2003 report, noting pain in neck and shoulders and numbness in her hands; 160 -- January 24, 2003 report, noting neck pain radiating to her shoulders, which was unrelieved by an injection of medication.)

For the foregoing reasons, the ALJ's credibility determination constitutes error that warrants reversal.

**C.   Further Testimony From A Vocational Expert May Be Necessary On Remand.**

Based on the foregoing, there are several matters to be reconsidered by the ALJ on remand.  As a result, the ALJ's conclusion regarding Plaintiff's RFC may change.  Therefore, the Court does not reach the fourth issue raised by Plaintiff regarding the propriety of the vocational expert's testimony that she can perform work in the national economy, as the finding regarding Plaintiff's RFC must be reassessed and additional testimony from a vocational expert likely will be required.

///

**D.**   **Remand Is Required.**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  *Id.* at 1179 ("the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings").  However, where there are outstanding issues that must be resolved before a determination of disability can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated, remand is appropriate.  *Id.*

Here, remand is the appropriate remedy to allow the ALJ the opportunity to remedy the above-mentioned deficiencies and errors.  *See, e.g.*, Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004)(where ALJ erred by discounting treating physicians' opinions, remand for further proceedings is appropriate if enhancement of the record would be useful); McAllister, 888 F.2d at 603 (remand appropriate to remedy defects in the record).

## CONCLUSION

Accordingly, for the reasons stated above, the denial of benefits is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.  Judgment shall be

28

entered reversing the decision of the Commissioner, and remanding the matter for further administrative action consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for Plaintiff and for Defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 26, 2007

/S/
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE

29